UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
    UNITED STATES OF AMERICA    :
                         :
       -v-                   :
                         :
EDGAR PALTZER,              :
                         :
          Defendant.    :
------------------------------------X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: |
| DATE FILED: 3-7-19 |

13 Cr. 282 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

By Order dated May 11, 2018 (hereinafter, the "Vaulted

Assets Order"), Dkt. 152, the Court modified a previous order,

which had placed restrictions on assets held in certain safe

deposit boxes at UBS AG in Zurich, Switzerland (collectively,

the "Vaulted Assets"), to allow defendant Edgar Paltzer, among

others, to transfer the Vaulted Assets to the underlying owners

of those assets after providing advance notice to and obtaining

the approval of the United States Attorney's Office for the

Southern District of New York.[1]

Terrie and Michelle Jensen and Christian Donica

(collectively, the "Jensens") and their clients are some of

these underlying owners. Prior to the instant criminal case, the

Jensens had arranged with Paltzer for Paltzer to keep custody of

the Vaulted Assets belonging to the Jensens and their clients,

---

[1] Familiarity with all prior proceedings in this case is here
assumed.

1

in exchange for a custodial fee based on a percentage of the
Vaulted Assets' value. See Jensens' Memorandum (attached) at 4;
Paltzer's Memorandum (attached) at 2. Subsequent to the Vaulted
Assets Order, Paltzer submitted to the Government proposed
instructions for the transfer of the Vaulted Assets back to the
Jensens and their clients. These instructions provide that
Paltzer will retain a portion of the Vaulted Assets as payment
of his fees and an additional portion as payment of future
litigation costs until the resolution of his fee dispute with
the Jensens.

The Court is now in receipt of letter briefing (attached)
from the Jensens and Paltzer as to the permissibility of these
instructions. The Jensens argue that the terms of the Vaulted
Assets Order forestall Paltzer from retaining any of the Vaulted
Assets as payment of his fees, and, more generally, that the
criminal case against Paltzer subjects the Jensens' fee
agreement with Paltzer to this Court's jurisdiction.
However, the issue of whether or not the previously agreed-upon
fees should be paid is clearly outside of the scope of the
instant criminal case and the Vaulted Assets Order. The Vaulted
Assets Order allows Paltzer to transfer the Vaulted Assets to
their underlying owners pursuant to the specified procedure, but
does not require that he do so or take any position on the
determination of ownership of the Vaulted Assets. The Government

2

has not sought forfeiture of the Vaulted Assets and does not consider Paltzer's retention of fees to be a violation of the terms of his supervised release or cooperation agreement. See Paltzer Mem. at 9.

Accordingly, the Court concludes that the inclusion of the fee retention clause in the proposed instructions for transfer does not violate the Vaulted Assets Order and that the fee dispute between the parties is not properly before this Court.

SO ORDERED.

Dated: New York, NY

March 6, 2019

JED S. RAKOFF, U.S.D.J.

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
UNITED STATES OF AMERICA,
                                          :
          - v -                                    MEMORANDUM
                                          :
EDGAR PALTZER,                                     13 Cr 282 (JSR)
                    Defendant,            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**This memorandum is filed on behalf of Terrie and Michelle Jensen, and Christian Donica
("the Jensens"), former clients of Edgar Paltzer, in connection with their efforts to access
assets owned by them and others. The assets are held in Switzerland under Paltzer's con-
trol, and to a large extent would be used to satisfy obligations to the IRS in connection with
multiple voluntary disclosure agreements.[1]  Paltzer is blocking access to the assets until he
is paid a substantial fee which originated in his pattern of criminal activity and he is now
claiming for a five year period during which this Court froze those assets.**

### 1.  Question Presented

Should Defendant Paltzer, who pled guilty before this Court to conspiring for over 12 years

to assist U.S. taxpayers in evading income taxes, be allowed to charge in excess of $1.1 million

in fees and "costs" arising from his exclusive control over assets owned by the "underlying own-

ers", for the over five-year period when such assets were frozen by order of Magistrate Judge

Ronald L. Ellis, prohibiting Paltzer from any access to the assets? Or should Paltzer return the

assets to the underlying owners as specified in the Court's Unfreeze Order of May 11, 2018?

These questions arise in the context of Paltzer's plea agreement which requires him to disgorge

"any fees generated from the criminal conduct charged in the Information . . . ."[2]

### 2.  Background

### a.  *Paltzer is Convicted for Conspiring to Assist U.S. Taxpayers to Evade Taxes*

---

[1] This memorandum is filed by email with the Court's clerk pursuant to her instructions.

[2] Order as to Edgar Paltzer at 21, *United States v. Paltzer*, No. 1:13-cr-00282-VM (S.D.N.Y. Sept 12, 2013), ECF.
No. 19.

Edgar Paltzer ("Paltzer") was indicted along with co-defendant Stefan Buck on April 16, 2013 in a 40-page conspiracy indictment charging them with providing assistance for over 12 years to U.S. taxpayers seeking to evade their U.S. tax obligations. Paltzer pled guilty on August 16, 2013. When he entered his plea, the United States Attorney's Office ("USAO"), proffered facts that Paltzer "provided financial intermediary services . . . help[ing] dozens of U.S. taxpayers maintain undeclared accounts in Switzerland, and these accounts in aggregate contained millions and millions of dollars in undeclared assets."[3] According to the plea agreement, Paltzer was to pay restitution including "the disgorgement of any fees generated from the criminal conduct charged in the Information, to be paid to the [IRS]."[4] This provision was repeated by the AUSA at the plea.[5] Although the Indictment in this matter specifically described only six clients of Paltzer's, the Information to which Paltzer pled guilty was much broader, referring to his conspiracy "from at least in or about 2000 through in or about at least 2012"[6] with "clients of PALTZER . . . who were U.S. taxpayers."[7]

On March 22, 2018, this Court sentenced Paltzer. The Court noted that the matter was a "particularly close question," and stated it was considering up to six months of incarceration.[8] Paltzer expressed remorse and replied that he was "truly sorry for the aggravation and the detriment which I have caused to everyone involved".[9] The Government then described Paltzer's cooperation as a "gold standard."[10] The Court noted the prosecution's characterization of the de-

---

[3] Order as to Edgar Paltzer, *supra* note 2, at 18 (page 17 native in document, page 18 stamped).
[4] *Id.* at 21.
[5] *Id* at 19-20 (page 18-19 native in document, page 19-20 stamped)
[6] Indictment at 6, *United States v. Paltzer*, No. 1:13-cr-00282-VM (S.D.N.Y. Apr. 16, 2013), ECF. No. 1.
[7] *Id.* at 38.
[8] Transcript of Proceedings at 2-3, *United States v Paltzer*, No. 1:13-cr-00282-VM (S.D.N.Y. April. 12, 2018), ECF. No. 149.
[9] *Id* at 8.
[10] Transcript of Proceedings, *supra* note 8, at 4.

fendant as "particularly truthful" and "particularly forthcoming".[11] The prosecution's comments "tip[ped] the balance" for the Court, which rather than incarcerate Paltzer, imposed two (2) years supervised release and a fine of $75,000 that the Court described as "substantial."[12]

### b.  *The Court Freezes the Vault Holding U.S. Taxpayer Assets Exclusively Controlled by Paltzer*

As part of his cooperation, which began over five years ago, Paltzer disclosed to the USAO that he controlled several vaults (collectively, the "Vault") storing physical assets at United Bank of Switzerland ("UBS") in Zurich, Switzerland.  The Vault holding these assets is linked to a specific financial account at UBS, and upon information and belief both are under the sole control of, and only accessible by, Paltzer and his wife under UBS procedures and current UBS powers of attorney ("POAs").  Paltzer had established the Vault to hold assets owned by U.S. citizens that were not being reported to the IRS, as described below.

In connection with Paltzer's plea, this Court froze the assets in the Vault on August 15, 2013 by order of Magistrate Judge Ronald L. Ellis ("the Freeze Order"), stating: "PALTZER [and his agents] shall not directly or indirectly, access, transfer, distribute, or otherwise move the assets . . . ."[13]

### c.  *The Vaulted Assets at Issue Are the Property of the Jensens and the other Owners*

Charles Jensen was the father of Terrie and Michelle Jensen.  He was a California businessman who previously assisted numerous U.S. citizens (the "Owners") in placing overseas invest-

---

[11] *Id.* at 9.

[12] *Id.* at 9-10.

[13] Redacted Order as to Edgar Paltzer at 1, *United States v Paltzer*, No. 1:13-cr-00282-VM (S.D.N.Y. Aug. 22, 2013), ECF. No. 13 [hereinafter Freeze Order]. Although the Jensens have not had access to the application for the original Freeze Order, we note that the Government must have believed those assets were related to Paltzer's crimes because the Order is styled "United States v. Paltzer."

ments.[14] He also invested some of his own assets overseas that later became part of his estate. The investments were varied, ranging from precious metals to annuities and currency.

In September 2008, Charles and his wife died unexpectedly within a few days of each other. It was left to Mr. Jensen's daughters, Terrie Jensen and Michelle Jensen, along with colleague Christian Donica, to deal with the resulting confusion. This period coincided with the beginning of the enhanced IRS and DOJ campaign against concealing taxable assets in foreign banks.

Following Mr. Jensen's death, the Jensens sought advice regarding these overseas assets from Paltzer, at the time a prominent attorney at a respected Swiss law firm. Paltzer advised the Jensens that the assets, both those now in Charles Jensen's estate and those belonging to the Owners, would be unreportable to the IRS if they were held in physical form in vaults under Paltzer's exclusive control. The Jensens followed Paltzer's advice and as a result, between 2010 and 2013, Paltzer, on behalf of the Owners and Jensens, stored physical assets in the UBS Vault maintained solely by Paltzer. In connection with this arrangement, Paltzer was to receive a fee of 0.24% of the market value of the assets per annum, and the Jensens were to receive 1.5% per annum. As part of this arrangement, Paltzer did not charge the Jensens a fee to store their own assets. Paltzer's duties were to pay annual storage costs to UBS, physically transfer earned fees biannually, and of course to return the assets upon request.[15] The Jensens have never seen nor entered the Vault.

### d. *The Jensens Successfully Coordinated the Owners and Themselves to Enter the IRS Offshore Voluntary Disclosure Program*

---

[14] As described below, sixteen of his clients ultimately had assets in the Vault at the time of Paltzer's indictment.
[15] Originally, Paltzer was to meet with and sign "deposit agreements" with each Owner, but shortly before Paltzer was indicted he expressed to the Jensens that such contracts were not necessary and indicated he did not wish to continue meeting the owners and signing contracts.

In April 2013, the Jensens learned from a newspaper article that Paltzer had been indicted by the U.S. government. The Jensens immediately hired counsel and entered the IRS Offshore Voluntary Disclosure Program ("OVDP"). This was just prior to the Court's Freeze Order of August 15, 2013. For context, tens of thousands of other U.S. taxpayers entered OVDP from 2009 to 2018.

The Jensens sought a resolution with the IRS for themselves and the Owners. As soon as the Court's Freeze Order was issued, the Jensens immediately ceased assessing fees to the Owners. With access or return of the assets impossible due to the Freeze Order, the notion of earning prospective fees seemed absurd, especially when many of the Owners and the Jensens would need the assets returned to pay taxes, interest, and penalties required under the OVDP process.

The Jensens and the IRS reached an agreement where the Jensens were given time to contact all of the Owners and urge them to enter OVDP. The Jensens were overwhelmingly successful, convincing every Owner to enter the program and even assisting them in finding knowledgeable counsel and securing necessary records from the banks.

The Jensens and the Owners made a full and complete disclosure to the IRS concerning the offshore assets and satisfied the provisions of OVDP and the IRS voluntary disclosure policy in place for decades. Neither the Jensens nor any of the Owners were charged with crimes due to their timely disclosures to the IRS.

The resulting workload and penalties for the Jensens and Owners were, however, substantial. Generally, 8 years of amended returns and Foreign Bank Account Reports ("FBAR") were required by OVDP. Back taxes and an accuracy penalty of 20% was assessed, along with an "FBAR penalty" as high as 27.5% of the highest balance of unreported assets. The Court should be aware that the IRS reduced penalties on some of the Owners to as little as 5% (rather than the

27.5%) because their conduct was considered "non-willful." The Jensens, however, paid the higher OVDP penalty.

Some Owners have managed to pay their full OVDP obligations, including penalties. However, millions of dollars in taxes and penalties still owed to the IRS by some of the Owners and the Jensens are dependent on the return of the assets in the Vault, with interest compounding daily. This was a common situation in the thousands of OVDP cases where taxpayers had to repatriate foreign assets in order to pay back taxes, interest, and penalties.

*e. The Jensens Have Worked for Years to Complete OVDP and Build a Plan to Return the Assets to the Owners and Jensens, Including to Pay the United States Government*

After entering OVDP, the Jensens began working tirelessly to formulate a resolution with IRS agents, the Owners and their counsel, UBS, counsel for Paltzer, and periodically with the USAO to reach the goal of returning the assets. For years the Jensens and Owners could not communicate directly with Paltzer due to the pending case, especially prior to his testimony for the Government in the Buck trial. In addition, as was common in OVDP, it took years to finalize submissions due to difficulties obtaining required paperwork from foreign banks. Major challenges arose due to the lack of access to the Vault by the Owners and Jensens.

The unwinding process has been complex due to the number of parties, attorneys, jurisdictions, and agencies, all with distinct interests and timelines. As a key part of this process, the Jensens began coordinating "asset disposition agreements" for each Owner to be reviewed and approved by all necessary parties ("Agreements"). The Agreements set out a careful plan and logistics for returning the assets that would meet everyone's goals. For example, the Owners insisted the Jensens were present when the Vault was opened to ensure inventories were accurate

and instruction letters carried out.[16]  Transactions that had to be overseen included the inventory-
ing and movement of relatively large quantities of physical gold, including transfer to secure
courier for delivery to the Owners, and/or liquidation.  All procedures had to be approved by
UBS and the USAO.

The Agreements also provided for the interests of the Government, which did not want the
assets released until full payment to the IRS.  Specifically, for the Owners who had not complet-
ed OVDP, the assets were to be sent to their counsel, who would first remit payment to the Gov-
ernment.  The Agreements therefore provided all necessary arrangements for the assets to be sold
and returned, including for payment to the IRS.

### f.  *The Plan Provided Paltzer Reasonable Hourly Fees to Ensure His Cooperation, with no Ob-jection and Years to Clarify Otherwise*

As sole signatory to the Vault and under UBS's procedures, Paltzer's cooperation was essen-
tial to get the assets returned efficiently.  Paltzer expressed his willingness to sign a POA em-
powering the Jensens to access the Vault to effect the Owners' instructions after advance ap-
proval by the USAO.  It was assumed Paltzer would be present in the Vault as well.

The Jensens therefore ensured that the Agreements provided for Paltzer's reasonable time
and cost to assist the Jensens in entering the vaults and carrying out the Owners' instructions,
including inventorying and distributing the assets.  The Agreements also stated "No other com-
pensation is due to Paltzer in connection with this Agreement or the Vaulted Assets."  A draft
Agreement was sent to Paltzer's counsel on April 11, 2017.  After opportunity to comment, the
draft Agreements were provided to the IRS and USAO.  At no time did Paltzer ever communi-

---

[16] The Jensens held the primary records of asset ownership and several times the records maintained by Paltzer
showed errors the Jensens had to correct.

Page 7 of 15

cate his intention to charge fees following the asset Freeze Order, nor did he object to the Agreements.

The Agreements were signed by the Owners and Jensens throughout 2017 and 2018, having then been reviewed by counsel for the Owners, counsel for the Jensens, counsel for Paltzer, UBS, the IRS, and the USAO. The process for closing the vaults, returning the assets, and paying the United States had finally been decided.

### g _Two Days Before Sentencing Paltzer Executed an "Unlimited" POA for the Jensens to Access the Vault; After Paltzer's Edits Caused Rejection by UBS, Paltzer Never Re-Executed_

Two days before his sentencing, on March 20, 2018, Paltzer executed a UBS standard form POA giving Terrie Jensen "unlimited" power to access the Vault. However, Paltzer struck four words of boilerplate language on UBS's form. On May 17, 2018, six days after the Unfreeze Order, UBS rejected the POA due to Paltzer's handwritten modification. The Jensens asked Paltzer to re-execute the POA. But due to delays by UBS and Paltzer, it took over two months for a response. On July 3, 2018 Paltzer expressed willingness to sign the POA, unmodified, but suddenly in association with an entirely new condition: five years of fees.

### h _Following Sentencing, Paltzer Asserts $716,000 in Fees, then Another $388,000 in Future "Costs"; Paltzer Rejects Offers for Resolution_

Four months after his sentencing and just as re-execution of the POA appeared imminent, Paltzer emailed a spreadsheet to the Jensens on July 9, 2018 that appeared to assess a 0.24% per annum fee on the Owners' assets. The fee was for the five years in which this Court forbade Paltzer to enter the Vault. Paltzer explained "I have the whole set of the past years prepared."[17] The asserted fees amounted to over $716,000.

---

[17] Paltzer purported to provide them "per your original instructions." The Jensens presume Paltzer means his original agreement prior to his indictment.

The Jensens disputed these fees for the period in which the assets were frozen. After all, Paltzer was barred from accessing the Vault, managing the assets, or even transferring the assets to allow the Owners and Jensens to pay the Government.

For six months the Jensens have attempted to settle this matter with Paltzer, including an offer to compensate Paltzer for his *actual* time and costs associated with the matter over the past five years (an amount far less than the fee sought by Paltzer). Paltzer has refused such offers. The Jensens also proposed the disputed fees be placed into an independent escrow account for later resolution so the remainder of the assets could be distributed to the Owners and themselves in order to pay the IRS upon approval of the USAO. Paltzer again refused the offer of an escrow unless he retain exclusive control over the assets, and later stated he would just take the fees, as he put it, "legalities aside." During this back and forth, the Jensens continued to seek a settlement. Not only did Paltzer refuse to lower his demand, during the negotiations he insisted on *another* $388,000 for unspecified future costs, bringing his demand to over $1.1 million.

In addition to the assets in the Vault, the Jensens have learned that Paltzer is withholding additional assets from the Owners and Jensens, presumably to cover a portion of his asserted Vault fees. It was discovered in 2017 that, against the instructions of the Owners and the Jensens, Paltzer also held – outside the Vault – diamonds, rare stamps, and rare autographs belonging to them. Furthermore, Paltzer held $410,000 in additional cash belonging to the Owners and Jensens for which final instructions had not yet been provided prior to Paltzer's indictment. All of these assets were declared by the Owners and the Jensens in their voluntary disclosures. In late November 2018, during the negotiations, Paltzer returned non-currency items held outside the Vault as "having no value to him." But he held back over $192,000 belonging to the Owners

to cover his asserted fees from the Vault, and $91,000 belonging to the Jensens for future "costs" involved in the Vault dispute.

Finally, on November 28, 2018, the Jensens offered a term sheet for a global settlement agreement. There has been no response.

## 3. Paltzer's Position

### a. *Paltzer Incorrectly Asserts that his Fees are a Civil Dispute*

Paltzer is now taking the position, post sentencing, that he is entitled to additional fees for the very period when the assets were frozen by the Court, preventing their return and rendering obsolete any meaningful "service" he once offered. We understand Paltzer's position to be summed as follows: (i) the Court's Unfreeze Order merely directs him to return the assets with approval of the USAO in any manner he chooses (and by implication, that he is an "underlying owner" that can receive the assets under the Unfreeze Order); (ii) the fee dispute is a private matter covered by Swiss law; (iii) his conduct and any contracts that formed do not violate Swiss Law, (iv) the assets are associated with no criminal conduct related to the Information, (v) a New York court does not have authority over his personal fee dispute, and (vi), he is not in violation of his supervised release provisions.

AUSA Sarah Paul has explained that the USAO does not believe the Court's Order of May 11, 2018, allows the USAO to direct Paltzer regarding the resolution of the matter of any disputed fees.

## 4. Jensen's Position

### a. *The Court has Authority to Resolve this Matter Because Paltzer's Criminal Conduct Directly Relates to Frozen Assets and for which the Owners and Jensens are Paying Millions in OVDP Penalties*

Although convenient for Paltzer to claim otherwise, the Vault are part of the pattern of activity for which Paltzer was investigated and pled guilty – that is, helping U.S. taxpayers conceal assets from U.S. tax authorities. In Paltzer's own words at his plea:

> From 2000 through 2012, working with others in the Swiss financial industry, I assisted U.S. taxpayers in evading the U.S. tax obligations of these U.S. taxpayers and in filing false tax returns with the IRS. [18]

More importantly, the USAO has always treated the Vault and its contents as part of Paltzer's criminal activity. The Vault was discussed as the final matter at Paltzer's plea hearing.[19] The USAO prepared the application that resulted in both the Freeze Order and Unfreeze Order using the caption "United States v. Paltzer."[20] It seems clear that at least during the time of those orders the USAO treated the assets in the Vault as part of Paltzer's criminal activity to which he pled guilty, and it is hard to imagine that Paltzer could claim otherwise in accepting responsibility for his conduct.

In fact, Paltzer knew that his conduct with regard to the Vault and related assets was part of his overall criminal activities. As an example, in connection with an account attached to the Vault at UBS, and in violation of Swiss law, he signed a false Form A, a document designed to report the "true owner" of various accounts and assets. Similarly, he created the same sort of false "structures" alleged in the Information for at least three of the Owners. These actions were designed to assist the U.S. taxpayers in concealing assets from the IRS and were clearly encompassed within the criminal conduct acknowledged by Paltzer at his plea hearing. Paltzer understood that the Jensens were being forced out of Swiss Banks concerned about the U.S. Government's pursuit of tax evasion utilizing foreign accounts and that the assets they were asking

---

[18] Order as to Edgar Paltzer, *supra* note 2, at 16 (page 15 native in document, page 16 stamped)

[19] Order as to Edgar Paltzer, *supra* note 2, at 20 (page 19 native in document, page 20 stamped).

[20] Freeze Order, *supra* note 13, at 1; Order as to Edgar Paltzer at 1, *United States v. Paltzer*, No. 1:13-cr-00282-VM (S D.N Y. May 14, 2018), ECF. No 152 [hereinafter Unfreeze Order].

Paltzer to conceal came from those financial institutions. He then stored them under a false Form A in order to maintain the concealment. This phenomenon of use of Swiss banks and the flight therefrom was widely known among the Swiss banking and professional community. (See the collection of prosecutions and non-prosecution agreements cited in footnote 22 *infra*.)

### b. *Paltzer's Position is Inconsistent with the Unfreeze Order Because he is not an "Underlying Owner"*

The Unfreeze Order allows for Paltzer to "move the Vaulted Assets to the underlying owners ... and/or their attorneys or pursuant to other instructions."[21] Instructions from each of the Owners and the Jensens have been provided to Paltzer and sent to the USAO for approval. Indeed, the Jensens were to be present operating under the POA to carry out those instructions. Paltzer has never re-executed the POA, has unilaterally modified the Owners' instructions with holdbacks covering $1.1 million, and now demands a ransom.

Paltzer's assertion that he became an "underlying owner" of the assets when the Freeze Order was signed is simply not consistent with the facts. This dispute relates to alleged fees accruing after that date. Paltzer appears to read the Unfreeze Order as allowing him to accrue an ownership interest over the intervening years. There is no reason to believe this was the Court's intent in executing the Unfreeze Order five years later. Paltzer also has never, to our knowledge, otherwise reported ownership of any of the assets. Indeed, as described below, it is unlikely he included in his pre-sentence financial disclosures to the Court any assets in the Vault, or any future receivables.

### c. *Any Contracts that Formed are Illegal and Swiss law is Irrelevant as to this Court's Authority of a Criminal it Convicts*

---

[21] Unfreeze Order, *supra* note 20, at 1 (emphasis added).

Paltzer's position that his associations with the Underlying Owners are not illegal under
Swiss law is irrelevant. His conduct in assisting U.S. taxpayers to conceal substantial assets in
Switzerland is entirely consistent with the broad scope of the language in the Information in his
plea. All of his actions with undeclared assets in Switzerland were directly part of the criminal
activity to which he pled guilty. The argument that it was legal, under Swiss law, for Swiss ad-
visors and financial institutions to help Americans hide money from the IRS has been routinely
rejected by U.S. prosecutors and courts over the past ten years.[22]

### d. *It Appears Paltzer Deliberately hid his Intention to Charge Fees from the Jensens, the Own-ers, and the Court until Sentencing was Complete*

While it is up to the Court to draw inferences from this chronology, it seems clear to the
Jensens that Paltzer concealed his intention to assert the fees at issue from them, the Owners, the
USAO, and the Court until after his sentencing. Indeed, he provided little input to the carefully
constructed resolution process agreed to by the Owners, Jensens, the IRS, UBS, and the USAO,
and then only at the end asserted his fee demands.

We believe that Paltzer has not been the "particularly forthcoming" defendant he represented
to the Court at sentencing. We have suggested to the USAO and Paltzer's counsel that we doubt
Paltzer listed accrued fees for managing these assets as receivables on his financial statement
submitted to the Court as part of the pre-sentence report. We have not received any indication to
the contrary.

### e. *Paltzer has Halted the Carefully Crafted Resolution Process, a Process he Reviewed and for Which he had Ample Opportunity to Contribute*

---

[22] *See Offshore Compliance Initiative*, U.S. Dep't of Justice, https://www.justice.gov/tax/offshore-compliance-initiative (last visited Feb 7, 2019); *Swiss Bank Program*, U.S. Dep't of Justice, https://www.justice.gov/tax/swiss-bank-program (last visited Feb. 7, 2019).

Paltzer had almost five years to clarify and submit Paltzer's intended fees during the complex and carefully coordinated resolution process. Paltzer silently watched as the draft Agreement provided for him in the form of hourly fees to assist in returning the assets and stated in black ink that Paltzer was owed no other fee "in connection with the Vaulted Assets."

Paltzer had multiple opportunities to inform the Owners and advise the USAO that in his mind, despite his criminal conviction, his fees were continuing to accrue. Rather, Paltzer now wants to recoup his claimed fees using his practical leverage as the exclusive key-holder, "legalities aside."

## f.  *Returning the Assets is Squarely Within Paltzer's Continuing Cooperation Requirement and Supervision Under his Plea Agreement*

The Court has authority to find that Paltzer's conduct in concealing U.S. taxpayer assets in the Vault under a Swiss Form A, and in his name only, was criminal, and to decide that he may not resort to "self-help" to recover his fees assessed while the Vault was frozen. We respectfully submit that Paltzer is an instrumentality of the Court with respect to the Vault, the same as he was when the Court ordered him not to enter the Vault or transfer its assets.

Only the Court can assess Paltzer's position that he is not in violation of his supervised release. But given that his plea agreement specifically requires him to disgorge any fees from his criminal conduct, his efforts to obtain yet additional fees after the sentencing seems inconsistent with that obligation.[23]

## g.  *Paltzer Seeks to Profit Ten Times the Amount of his Fine as a Result of the Court's Freeze Order*

This Court sentenced Paltzer to a "substantial fine" of $75,000. However, if the Unfreeze Order permits Paltzer to collect his demand of over $1.1 million in fees and "costs", the Freeze

---

[23] The record as available to the Jensens does not reflect that Paltzer has disgorged the fees from the "dozens" of U.S. taxpayers he assisted in evading taxes.

Order would have involuntarily forced the Owners to maintain Paltzer's services resulting in a windfall profit to Paltzer of almost *ten times* the Court's "substantial penalty." We respectfully suggest that the Court could not have intended such a result.

## 5. Conclusion

After Paltzer promised openness, cooperation, and disgorgement, Paltzer now seeks to convert the Court's order into over a million dollars in profit for the very pattern of activity he pled guilty. Having carefully evaded the issue of fees for five years—then maneuvered through sentencing without having to take a position—Paltzer has now gone on the offensive. As a result, he has upended the carefully built, reviewed, and approved resolution process, preventing millions of dollars in payment to IRS. Interest and penalties mount daily.

A proposed Order addressing requested relief is attached to this memorandum.

Finally, upon information and belief, the Probation Department occasionally terminates Supervised Release early. Given that the Court's powers over Paltzer derive from his supervised release, we most respectfully request that such supervision not be terminated early.

Respectfully submitted,

Mark E. Matthews
Counsel for the Jensens
Caplin & Drysdale, Chtd
One Thomas Circle, NW Suite 1100
Washington, D.C. 20016
(202-862-5082

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
UNITED STATE OF AMERICA,
                                              :
        - v -                                        ORDER
                                              :
EDGAR PALTER,                                        13 Cr 282 (JSR)
                Defendant,                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

        With respect to the above-captioned matter and the dispute regarding potential fees

owned to the Defendant Paltzer arising from the "Vaulted Assets" subject to the Court's Order of

May 11, 2018:


IT IS HEREBY ORDERED:

(1)     Paltzer is entitled to no fees from the date of the Freeze Order forward.

(2)     Paltzer is to cooperate with the execution of an appropriate POA acceptable to UBS

giving Terrie Jensen co-equal access and authority over the Vault.

(3)     Paltzer shall provide to Terrie Jensen all keys and other access controls to the Vault.

(4)     Paltzer is to promptly return funds belonging to the Owners and Jensens held in his

possession outside the Vault.

(5)     Paltzer shall cooperate and sign any transfer instructions with regard to the assets in the
vault, but only after approval by the United States Attorney's Office.

(6)     Reasonable UBS bank fees will be covered by the Owners and Jensens, including UBS

vault storage rental costs from the date of the Freeze Order.

SO ORDERED:


_____
The Honorable Jed S. Rakoff
United States District Judge

Date:          New York, New York
               February ___, 2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                        :
UNITED STATES OF AMERICA,
                                        :
        - v -                                  REPLY MEMORANDUM
                                        :
EDGAR PALTZER,                                 13 Cr 282 (JSR)
                Defendant,               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**This reply memorandum is submitted in response to defendant Edgar Paltzer's letter brief filed on February 7, 2019 ("Brief"), in the above-captioned matter, concerning fees asserted by defendant related to his control over a Vault subject to Freeze Order by this Court. Capitalized terms are defined in the previously submitted memorandum ("Memorandum").**

## 1. Responses

### a. *Paltzer's Attempt to Quarantine the Vault from his Criminal Conduct Fails Because the*

### *Facts and Information to which Paltzer Pled Guilty Are Broad*

Paltzer's Brief attempts to separate Paltzer's conduct with the Vaulted Assets from the years-long course of conduct outlined in the Information to which he pled guilty, and then frame that conduct as non-criminal. He relies heavily on the assertion that there "are no averments in either the Indictment or the Superseding Information that state any facts regarding the Jensens, the Clients or the Vaulted Assets."[1] Paltzer claims that he has not violated his cooperation agreement nor the terms of his supervised release,[2] that his requested fees "are not the proceeds of criminal activity,"[3] and that "Paltzer will not profit from any criminal activity."[4] Creating this distance is critical for Paltzer, because any link will trigger the legal requirement in his plea

---

[1] Paltzer's Letter Br 6, 10.

[2] Id. at 3.

[3] *Id.* at 10. Paltzer refers to the Vaulted Assets as "proceeds" in the same sentence he mentions forfeiture. We respectfully submit that there has never been a hint of specified unlawful activity in this case that would implicate forfeiture. On the other hand, Paltzer's fees are clearly continuing "proceeds" from his original criminal conduct in concealing the assets in the Vault.

[4] *Id* at 11.

agreement to disgorge "any fees generated from the criminal conduct charged in the Information...."[5]

Paltzer's references to the cooperation agreement and supervised release deflect attention from the real issue – that Paltzer cannot say that his conduct with respect to the Vaulted Assets was not criminal conduct to which he pled guilty. The facts and Information to which Paltzer pled easily encompass the Vault (especially in light of the additional facts provided below). The language of the Information plainly reaches the full breadth of Paltzer's criminal conduct, extending beyond the six clients specifically described in the earlier Indictment. In fact, during the plea allocution, AUSA Jason Cowley provided a summary of Paltzer's activities and referred to Paltzer "help[ing] *dozens* of U.S. taxpayers maintain undeclared accounts in Switzerland . . . ."[6] Paltzer did not dispute this at the time and even referred to providing his "services to individuals from numerous countries."[7] Whether or not the Jensens are specifically referenced in the Superseding Information to which he pled guilty, the Information quite clearly describes his conspiracy "from at least in or about 2000 through at least in or about 2012"[8] and with:

> "others known *and unknown*, willfully and knowingly . . . [to] defraud the United States of America and the IRS for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, to wit, federal income taxes."[9]

If Paltzer's activities with respect to the Vault are part of his criminal conduct, then any potential fees from 2013 to 2019 are unambiguously "generated" from his prior criminal conduct

---

[5] Order as to Edgar Paltzer at 21 (Plea agreement page 1), *United States v. Paltzer*, No. 1.13-cr-00282 (S.D N.Y. Sept. 12, 2013), ECF. No. 19. We note again that the public record contains no indications that any such disgorgement has been sought or paid with respect to any Paltzer clients, perhaps explaining Paltzer's willingness to seek yet more fees

[6] Transcript of Proceedings as to Edgar Paltzer re. Plea held on 8/16/13 at 17, *United States v. Paltzer*, No. 1:13-cr-00282 (S.D.N.Y. Aug. 28, 2013), ECF No. 15 [hereinafter Plea Transcript] (emphasis added).

[7] *Id.* at 15.

[8] Superseding Information at 1, *United States v Paltzer*, No. 1:13-cr-00282-VM (S.D.N.Y. Aug. 16, 2013), ECF No. 9.

[9] *Id.* at 1–2 (emphasis added)

and would constitute continuing "profits" from that conduct. Indeed, such a concept seems implicit in the entry of the Freeze Order, and once entered we cannot imagine that the Court anticipated anyone, including the Jensens, could lawfully earn fees arising from "managing" those assets which no one could even touch.

## b. *Paltzer's Conduct with the Vaults Directly Relates to the Crimes to Which He Pled Guilty*

Against the backdrop of his broad plea and cooperation, Paltzer's description of his activities assisting taxpayers to conceal assets as unrelated to his criminal activity is simply not credible. Indeed, Paltzer's innocent characterization only arose post-sentencing. In the trial against Paltzer's co-defendant, Stephan Buck, Paltzer testified about his use of the Vault as part of his criminal conduct.[10] On cross-examination, Paltzer explained that during his two-day interview with USAO beginning on July 9, 2013, he knew the Vaulted Assets came from undisclosed accounts and that he intended to conceal them:

> "[Counsel for Buck:] I'm asking if the plan that you were involved in was to keep the gold in your vault until the U.S. statute of limitations on the tax offenses passed. And did you tell that to the government?
>
> [Paltzer:] Yes, I told that to the government."[11]

It is clear that Paltzer's own acknowledgements that Vaulted Assets were involved in the tax conspiracy to which Paltzer eventually pled guilty precipitated that Freeze Order, which was entered one month after Paltzer's USAO debriefing sessions and as the last order of business at his plea. In fact, on the afternoon of Paltzer's guilty plea, AUSA Jason Cowley contacted the undersigned counsel to advise that the Jensens were the subject of an investigation. That

---

[10] Transcript of Proceedings as to Stefan Buck re: Trial Held on 11/3/17 at 104 (page 643 native in document), *United States v. Paltzer*, No. 1:13-cr-00282 (S.D.N.Y. Dec. 6, 2017), ECF No. 119 [hereinafter Buck Trial Transcript Held on 11/3/17].

[11] *Id.* at 106 (page 645 native in document).

investigation was terminated when the USAO verified that the Jensens had properly contacted the IRS and entered OVDP, including guiding the Owners into the program as well.

A series of facts further show that Paltzer's conduct was criminal and that he knew it when he entered his plea. For three of the Owners, as well as the Jensens, Paltzer set up the very structures for which he was indicted[12] and testified were intended to "[d]isguise the U.S. person from being disclosed to the IRS . . . ."[13] He then concealed funds at Bank Frey under those structures.[14] He signed a custodial agreement with another Owner in the name of a British Virgin Islands corporation, which jurisdiction he described at trial as a tax haven he utilized.[15] As described in our initial Memorandum, Paltzer was initially to meet with and sign written contacts to document his relationship with each Owner, but after signing only a few agreements decided he no longer wanted to document the relationship or meet the Owners. Paltzer accepted the gold and currency held in the Vault from Rahn & Bodmer, the same bank where Paltzer had previously referred at least two of his clients in order to setup undisclosed accounts.[16] The contact Paltzer worked with at Rahn & Bodmer in relation to the Vaulted Assets was Mr. Martin Dunki, indicted in this District on November 13, 2014 for tax conspiracy.[17] Following Paltzer's indictment, Paltzer recommended that the Jensens and Owners enter the IRS Voluntary Disclosure Program ("OVDP"), a completely unnecessary recommendation if he actually believed the Vaulted Assets were compliant. As mentioned in our initial brief, Paltzer filed false

---

[12] Transcript of Proceedings as to Stefan Buck re: Trial Held on 11/2/17 at 115 (page 460 native in document), *United States v. Paltzer*, No. 1:13-cr-00282 (S.D.N.Y. Dec. 6, 2017), ECF No. 117 [hereinafter Buck Trial Transcript Held on 11/2/17].

[13] Transcript of Proceedings as to Stefan Buck re: Trial Held on 10/31/17 at 185 (page 306 native in document), *United States v. Paltzer*, No. 1:13-cr-00282 (S.D.N.Y. Dec. 6, 2017), ECF No. 115 [hereinafter Buck Trial Transcript Held on 10/31/17].

[14] Buck Trial Transcript Held on 11/2/17, *supra* note 12, at 116 (page 461 native in document).

[15] Buck Trial Transcript Held on 10/31/17, *supra* note 13, at 183, 185 (pages 304 and 306 native in document).

[16] Believed to be Swiss Bank No. 2 in Paltzer's Indictment at 10, *United States v. Paltzer*, No. 1:13-cr-00282 (S.D.N.Y Apr. 16, 2013), ECF No. 1..

[17] Indictment, *United States v. Dunki*, No. 1:14-cr-00747 (S.D.N.Y. Nov. 13, 2014), ECF No. 1.

Form A's with UBS to conceal ownership of the Vaulted Assets, a serious violation of Swiss law.

Even after accepting the Vaulted Assets, Paltzer tried to use the Vault as a vehicle for concealment. Paltzer attempted unsuccessfully to cash out the funds held in the structures he had set up at Bank Frey in the form of gold, which he planned to deposit in the Vault.[18] He also considered utilizing the vault mechanism for his other clients. In the case of his client Mr. Kim, Paltzer proposed that funds from undisclosed accounts at Bank Frey be cashed out and placed into a vault.[19]

In short, it is clear that the USAO at the time deemed Paltzer's conduct with respect to the Vaulted Assets, the Jensens, and the Owners as criminal conduct in furtherance of the evasion of U.S. taxes. It defies the law, and common sense, to conclude that the Jensens and the Owners are not within the "dozens" of clients mentioned by AUSA Cowley during Paltzer's plea.[20] We note again that the Jensens and all the Owners have completed their OVDP filings, brought all their assets into tax compliance, and agreed to pay back taxes, penalties, and interest as specified by the disclosure program.[21] However, that the assets are now declared does not change the fact that Paltzer's conduct was criminal and he has pled guilty to it.

c. *Paltzer's Claim that the Vaulted Assets Were Returnable on Request is Incorrect and Irrelevant*

Paltzer indicates in his letter brief that the Vaulted Assets were always available upon request, apparently to shift some responsibility to others for the passage of time and justify claiming over $1.1 million in fees and unspecified costs. In the first instance, there is no

---

[18] Buck Trial Transcript Held on 11/3/17, *supra* note 10, at 96 (page 635 native in document).

[19] Buck Trial Transcript Held on 11/3/17, *supra* note 10, at 94 (page 633 native in document).

[20] Plea Transcript, *supra* note 6, at 17.

[21] Most of the Owners have fully paid their taxes and penalties, but as indicated in our initial memorandum, a few, including the Jensens, need their assets from the Vault to make final payments.

relevance to this stated position as to whether he should actually get paid for doing nothing for five years, especially when he concealed this intention and did nothing in reliance on any delay.

Paltzer's assertion also ignores the complexity required to unwind the financial issues in this matter in which Paltzer had a major hand in creating. Paltzer was directly involved in establishing the vaults with their informal records, causing significant effort by the Jensens to recreate accurate inventories. It took multiple years for the Owners and the IRS to complete the OVDP process and determine the amount of the Vaulted Assets due to the IRS. Considerable discussions with UBS were required to create a mechanism for repatriation of the assets consistent with Swiss law (completely unnecessary if the Vaulted Assets could be freely returned as claimed by Paltzer). It is telling that, despite disruption to his income and what are assumed to be significant costs of his situation, Paltzer never asked the USAO to unfreeze the Vault so he could collect any of the *ten* bi-annual payment periods for which he now claims fees. As stated in our memorandum, we suspect Paltzer did not include these alleged receivables in his financial statement filed with the Probation Department.

### d. *Jurisdiction and Standing*

Paltzer contends his custody arrangement and fees are purely a civil law matter. However, because the Court froze the Vaulted Assets in connection with Paltzer's case, presumably on the claim that they were involved with Paltzer's criminal conduct, we respectfully suggest that the Court is the first authority over the disposition of these assets. This is especially the case where the defendant stands to opportunistically profit from the Freeze Order, a result which may have been unexpected by the Court.

While civil law is not the issue before the Court, Paltzer's contention that his fee is "reasonable" and due whether he "engaged with" the Vaulted Assets or not entirely misses the

mark. All custodians have a fundamental duty to return assets under their control; no fee is reasonable when the "custodian" has his control removed and is powerless to return the assets. It is remarkable for Paltzer to claim that the Jensens and Owners will be "unjustly enriched" as they watch their required tax interest payments continue to mount.

Paltzer's letter brief also raises the issue of the Jensen's standing in this matter. The assets at issue all belong to the Jensen's and the other Owners. The Court was asked by the U.S. Government to freeze them. We respectfully suggest that the Owners have sufficient standing to be heard on the disposition of their assets, particularly on an issue of interpretation of the Court's previous Unfreeze Order.

## 2.  Corrections/Clarifications

The following factual corrections are offered:

*Bank Instructions:* Paltzer's Brief formulates the general issue as whether "certain proposed instructions submitted by Edgar Paltzer to the government"[22] should be approved, and indicates such instructions were "drafted" by Paltzer.[23] This formulation makes it appear that the proposed instructions for unwinding the Vaults originated with Paltzer, perhaps as an example of his cooperation. But Paltzer's "proposed instructions" are merely handwritten edits adding his claimed fees and costs to the detailed instruction letters prepared by the Jensens and signed by the Owners.

*Origin of Advice·* Paltzer states in his Brief that the Jensens represented that all assets were disclosed. Paltzer also testified in *United States v. Buck* that, as he recalls, the plan to hold the assets in the Vault until the statute of limitations on tax violations ran was that of the Jensens.[24]

---

[22] Paltzer's Letter Br. 1.

[23] *Id* at 2.

[24] Buck Trial Transcript Held on 11/3/17, *supra* note 10, at 104–07 (page 643–46 native in document).

Page 7 of 10

The Jensens refute both claims. Paltzer was recommended as someone who could help the Jensens and Owners in their predicament following Mr. Jensen's death. Paltzer describes himself as a provider of "everything associated with private wealth planning."[25] Paltzer holds an advanced L.L.M degree in Taxation, and was an attorney not only in Switzerland but also in the State of New York. As his testimony suggests, he was an expert in structures used to conceal assets, well versed in the banking world, and located in the heart of Zurich at a reputable Swiss law firm. These were the very reasons the Jensens sought his advice, now clearly misguided and regrettably relied upon. Regardless, it is Paltzer's knowledge and participation, whether arising from his own advice or elsewhere, that matters. His advice here was specifically directed at continuing a pattern of concealment.

*Michelle Jensen:* Michelle Jensen is not and has never been an attorney, as stated in Paltzer's letter brief and in his testimony in the *Buck* trial.[26]

*Citation Correction:* In our initial Memorandum, we incorrectly cited one phrase from the Indictment concerning "clients of Paltzer," as appearing again in the Information. We notified counsel and the Court's clerk of this error in an email on February 19, 2019, and apologize for the error. The point remains the same however – that the Information language is very broad as described above and clearly encompasses Paltzer's activities with respect to the Vaulted Assets.

### 3. Amended Order

It has come to our attention, via Paltzer's testimony on cross examination at the *Buck* trial,[27] that there may be a sixth UBS vault holding assets of the Jensens and/or Owners. Only five

---

[25] Buck Trial Transcript Held on 10/31/17, *supra* note 13, at 178 (pages 299 native in document).

[26] Buck Trial Transcript Held on 11/2/17, *supra* note 12, at 112 (page 457 native in document).

[27] Buck Trial Transcript Held on 11/3/17, *supra* note 10, at 101 (page 640 native in document).

vaults were specified in the Freeze Order.[28] It is respectfully requested that any prospective order of the Court include a sixth vault, if any, and any assets currently or previously stored in such sixth vault.

In addition, we have consulted with UBS about the best procedures to obtain repatriation of the assets consistent with Swiss law. It seems likely that this will require among other things, new Powers of Attorney, new "transactional" Form As (the Swiss required document as to true ownership of assets) and an inventory of the vault. Accordingly, we have modified the attached proposed order to include the broadest possible direction for Paltzer to cooperate in this process, including simply turning over the assets to another custodian—all as only approved in advance by the U.S. Attorney's Office. A modified order accompanies this reply brief.[29]

## 4. Conclusion

Paltzer wants to excise his Vault activities from his criminal conduct. He simply cannot. The Information to which he pled guilty easily encompasses the facts and circumstances of the Vault and the Vaulted Assets. Paltzer conceded this at the *Buck* trial. After concealing his position regarding more fees until after sentencing, his post-sentencing position seems incompatible with his obligation to accept responsibility for his conduct. We respectfully submit

---

[28] Redacted Order as to Edgar Paltzer at 1, *United States v. Paltzer*, No. 1:13-cr-00282-VM (S.D.N.Y. Aug. 22, 2013), ECF No. 13.

[29] It is our understanding from the bank that Paltzer's wife, Gabriele Paltzer, may be needed to sign some of these documents. The initial order to freeze the assets named Ms. Paltzer as well, and we have no reason to believe Paltzer cannot ensure her cooperation with Court ordered requirements as to the assets.

that the assets should be returned in full to the true "underlying owners", as specified in the

Court's Unfreeze Order.

Respectfully submitted,

Mark E. Matthews
Counsel for the Jensens
Caplin & Drysdale, Chtd
One Thomas Circle, NW Suite 1100
Washington, D.C. 20016
(202) 862-5082

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                :
UNITED STATES OF AMERICA,
                                                :
          - v -                                           ORDER
                                                :
EDGAR PALTER,                                             13 Cr 282 (JSR)
                 Defendant,                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

With respect to the above-captioned matter and fees asserted by Defendant Paltzer arising

from the "Vaulted Assets" subject to the Court's Order of May 11, 2018:

IT IS HEREBY ORDERED:

(1)    Paltzer is not entitled to any fees in connection with the Owners or Jensens from the date

of the Freeze Order (August 15, 2013) forward.

(2)    Paltzer is to fully cooperate in returning the Vaulted Assets (and assets in any sixth

vault), in full, to the Owners and Jensens, including but not limited to providing the Jensens with

keys or other access controls to the Vault, signing and maintaining valid Powers of Attorney in

favor of the Jensens satisfactory to UBS, and signing transactional Form As and any other

documents required to effect transfer of the assets, in all cases with advance notification to and

under supervision of the USAO.

(3)    Paltzer is to promptly return assets belonging to the Owners and Jensens held in his

possession outside of the Vault according to their instructions.

(4)    Reasonable UBS bank fees will be covered by the Owners and Jensens from the date of

the Freeze Order forward, including but not limited to storage costs for rental of the Vault.

(5)     Paltzer is not to revoke any Powers of Attorney without advance approval of the USAO.

SO ORDERED:


---
The Honorable Jed S. Rakoff
United States District Judge

Date:          New York, New York
               February ___, 2019

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
TAIWAN
BOSTON
HOUSTON
AUSTIN
HANOI
HO CHI MINH CITY

# DuaneMorris®

*FIRM and AFFILIATE OFFICES*

THOMAS W OSTRANDER
DIRECT DIAL: +1 215 979 1802
PERSONAL FAX: +1 215 689 3639
*E-MAIL* ostrander@duanemorris com

*www duanemorris com*

SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NEWARK
LAS VEGAS
CHERRY HILL
LAKE TAHOE
MYANMAR
OMAN
*A GCC REPRESENTATIVE OFFICE
OF DUANE MORRIS*

ALLIANCES IN MEXICO
AND SRI LANKA

February 7, 2019

VIA E-MAIL
Katherine_Munyan@nysd.uscourts.gov

The Honorable Jed S. Rakoff
United States District Court for the
 Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1340
New York, NY 10007

> Re:    USA v. Edgar Paltzer; No. 1:13 CR 282-01 (JSR)

Dear Judge Rakoff:

In accordance with the court's directive of January 16, 2019, Edgar Paltzer submits this

letter brief.

## I.    Summary

The issue is whether the U.S. Attorney's Office for the Southern District of New York

(the "Government") should approve certain proposed instructions submitted by Edgar Paltzer to

the Government enabling Paltzer to transfer assets held in several bank vaults in Switzerland (the

"Vaulted Assets") to the owners of those Vaulted Assets to permit them to pay tax liabilities

owed to the United States.

DuaneMorris

The Honorable Jed S. Rakoff
February 7, 2019
Page 2

.    The Vaulted Assets are subject to the court's order of August 15, 2013, as modified by

order dated May 11, 2018 ("the Court Order").The Court Order provides that Paltzer may

"...transfer, … the Vaulted Assets[1] to the underlying owners of those assets and/or their

attorneys…, in all instances with advance notice to and approval of the United States Attorney's

Office for the Southern District of New York".

    The Vaulted Assets belong to Terrie Jensen, Michelle Jensen and Christian Donica

(collectively the "Jensens") and to the Jensens clients (the "Clients"), respectively. The Jensens

instructed Paltzer to keep custody of the Vaulted Assets and they agreed to pay him a custodial

fee based on a percentage of the value of the Vaulted Assets.

    In the course of planning for the transfer of the Vaulted Assets, the Jensens' counsel

submitted to the Government and to Paltzer's counsel a document titled Asset Sale and Transfer

Breakdown (the "Jensen Asset Sale and Transfer Breakdown"). Based on the Jensen Asset Sale

and Transfer Breakdown, Paltzer drafted and his counsel submitted to the Government and to the

Jensens' counsel proposed instructions for the disbursement of the Vaulted Assets ("the

Proposed Instructions"). The Proposed Instructions primarily provide for: (1) the transfer of

Vaulted Assets owned by the Jensens and by the Clients to their respective U.S. based lawyers'

trust accounts to provide the necessary funds to pay certain tax liabilities and (2) the retention in

---

[1]    Defined in the order of August 15, 2013 as "…the assets held in (listed safe deposit
boxes) each of which is held at UBS AG in Zurich, Switzerland…"

The Honorable Jed S. Rakoff
February 7, 2019
Page 3

DuaneMorris

the vault of those amounts which the Jensens labeled in the Jensen Asset Sale and Transfer

Breakdown as "Paltzer disputed fees to Escrow"[2] ("the Disputed Fees").

The Jensens and the Clients oppose the Proposed Instructions, because: (1) they dispute

that the Clients owe the Disputed Fees and (2) pending the resolution of the controversy over the

Disputed Fees, they demand that the Disputed Fees be held by an escrow agent.

The Jensens and the Clients assert that Paltzer is not entitled to the Disputed Fees

because: (1) he is attempting to profit from his criminal activity by collecting the Disputed Fees;

(2) he is in violation of his cooperation agreement with the Government and of the conditions of

his supervised release; and (3) the Court Order vitiates the custodial fee agreement.

The Jensens' and the Clients' positions are without merit. Collecting a negotiated fee for

the safekeeping of the Vaulted Assets while in the constructive custody of the court is not

profiting from illegal activity. The Government agrees that Paltzer is not in violation of his plea

agreement or any conditions of his supervised release and that the collection of the Disputed

Fees would not violate either his cooperation agreement or the terms of his supervised release[3].

As to the Court Order, it simply puts conditions on access to the Vaulted Assets. Paltzer's

---

[2]    Paltzer and the Jensens agreed to a fee for the custody of the Vaulted Assets. The
Disputed Fees are the custodial fees for the Vaulted Assets for the period August 15, 2013
through the present (the period during which the Vaulted Assets are subject to the Court Order).
The Proposed Instructions also provide for the retention in the vault of a Litigation Reserve,
described below.

[3]    See The Government's Position at Section IV, below. As noted there the Government
takes no position on whether Paltzer is entitled to the Disputed Fees.

The Honorable Jed S. Rakoff
February 7, 2019
Page 4

# DuaneMorris

Proposed Instructions are in accord with the Court Order and the Government agrees. Further,

the Court Order does not vitiate a contract made in Switzerland concerning the payment of

custodial fees for the Vaulted Assets held in vaults rented by Paltzer at a Swiss bank in Zurich,

Switzerland.

## II.     Factual Background

### A.     Paltzer and the Jensens

Edgar Paltzer is a Swiss attorney and financial intermediary in Switzerland. Terrie

Jensen and Michelle Jensen (sisters) and Christian Donica, (collectively "the Jensens") are all

attorneys licensed to practice law in California. In 2008, the Jensens told Paltzer that they and

their Clients had physical gold and cash that they wanted to hold outside the United States to

avoid the possible confiscation of the gold (as occurred in 1933). Paltzer rented vaults at UBS in

Zurich, Switzerland into which he deposited the gold and cash owned by the Jensens and by the

Clients. These are the so-called Vaulted Assets. The Jensens told Paltzer that they and their

Clients were U.S. tax reporting compliant.

The Jensens on their own behalf and on behalf of the Clients agreed with Paltzer on the

fees for the custody of the Vaulted Assets ("the Fee Agreement"). The Fee Agreement provides

the following recurring fees: An annual fee of 1.74% on the value of the Vaulted Assets of which

DuaneMorris

The Honorable Jed S. Rakoff
February 7, 2019
Page 5

1.5% was due to the Jensens and 0.24% was due to Paltzer, and an additional fee to reimburse

Paltzer at 650 Swiss Francs per hour for any work he did[4]. The custodial fee was not charged on

all the Vaulted Assets. The Jensens themselves had approximately $10M in Vaulted Assets, but

by agreement, Paltzer did not charge them a custodial fee.

The Vaulted Assets for each of the Clients are segregated into small boxes in the vault.

Paltzer's accountant periodically calculated the custodial fees due and Paltzer entered the amount

of the fees into an Excel spreadsheet. As agreed, Paltzer from time to time accessed the vaults

and removed from the individual box of each Client's Vaulted Assets the funds to pay the

custodial fees owed to the Jensens and to Paltzer, respectively. Paltzer deposited the fees owed to

the Jensens into their box and removed his own fee from the vaults. The Jensens from time to

time traveled to Switzerland and reviewed the Excel spreadsheets. In particular, Christian Donica

would compare the entries in the Excel spreadsheets with his own records. Sometimes he would

note a mistake which was then corrected. There were no disagreements on the amount of the

Disputed Fees. In fact, the Jensen Asset Sale and Transfer Breakdown contains for each Client

---

[4] Paltzer did not charge an hourly rate for any services performed, although he could have.
The Disputed Fees at issue here are the 0.24% custodial fee alone. There is no dispute among the
parties as to the amount of the custodial fee Paltzer claims he is due. The dispute is whether he is
entitled to the custodial fees. The 0.24% annual custodial fee charged by Paltzer is substantially
less than the typical custodial fees charged for the physical storage of gold in Switzerland. See:
Suisse Gold (www.suissegold.ch) - 0.5%;  Or Suisse (www.orsuisse.ch) -  0.6% ; Suisse Bullion
(www.swissbullion.ch ) – 1.5%

DuaneMorris

The Honorable Jed S. Rakoff
February 7, 2019
Page 6

an accurate calculation of the fee Paltzer claims for the period after the entry of the August 2013

Court Order.

## B.     The Indictment, the Plea Agreement, and the Sentence

In April 2013, an indictment charged Paltzer with various tax offenses ("the Indictment").

On August 16, 2013, Paltzer pleaded guilty to the sole count of a Superseding Information that

charged him with participating in a conspiracy to defraud the IRS and to commit offenses against

the U.S. in violation of 26 U.S.C. sections 7201 and 7206(a). There are no averments in either

the Indictment or the Superseding Information that state any facts regarding the Jensens, the

Clients or the Vaulted Assets.

Paltzer entered his plea of guilty pursuant to a cooperation agreement with the

Government. Between the date of his cooperation agreement and today, Paltzer has fully

cooperated with the Government and he is not in violation of his cooperation agreement. In

March 2018, Paltzer was sentenced to time served, a fine of $75,000, a $100 special assessment

and two years of supervised release subject to standard conditions. Paltzer has paid the fine and

the special assessment and has not violated any conditions of his supervised release.

## III.    The Proposed Instructions Regarding the Transfer of the Vaulted Assets

On November 26, 2018, Paltzer's counsel provided the Government the Proposed

Instructions. The general concept of the Proposed Instructions is to:

(i) deliver the Vaulted Assets to a UBS  account associated with the vault at UBS ("the

Linked Account"),

DM3\5608517 1

DuaneMorris

The Honorable Jed S. Rakoff
February 7, 2019
Page 7

(ii) have UBS convert the Vaulted Assets into U.S. dollars and credit the net sale
proceeds to the Linked Account,

(iii) have UBS wire transfer from the Linked Account the net sale proceeds in U.S.
dollars to the respective trust accounts of the U.S. lawyers for the Jensens and for the Clients for
payment of any outstanding U.S. tax liabilities,

(iv) have Paltzer deliver Vaulted Assets directly to Clients in the instances where that
client has no tax liability and wants to keep the Vaulted Assets in Switzerland, and

(v) have Paltzer retain in the vault an amount equal to the so-called Disputed Fees (as
calculated by the Jensens in the Jensen Asset Sale and Transfer Breakdown) plus an additional
amount retained only from the Jensens' Vaulted Assets to cover future costs ("the Litigation
Reserve"[5]).

In sum, the Proposed Instructions provide that all activity regarding the Vaulted Assets is
and will continue to be subject to advance notice to and the approval of the Government as
required by the Court Order. The Government believes that the proposed instructions are in
accord with the May 2018 Order.

---

[5]   The Jensens have threatened Paltzer with litigation relative to his activities concerning
the Vaulted Assets. Swiss law provides for the payment of costs by an "unsuccessful party". The
Litigation Reserve is to provide a source to pay Paltzer his litigation costs if the Jensens follow
through on their threat and should the Jensens be the "unsuccessful party". Once the controversy
over the Disputed Fees is resolved, the Disputed Fees and the Litigation Reserve will be
disbursed in accordance with the Court Order.

The Honorable Jed S. Rakoff
February 7, 2019
Page 8

DuaneMorris

## IV.    The Government's Position[6]

In the course of Paltzer's cooperation with the Government, he disclosed to the

Government his relationship with the Jensens, the existence of the Vaulted Assets, and his

knowledge with respect to the source of those assets. The Government found Paltzer to be

credible on these topics, as with all other topics that were the subject of his cooperation. As

previously described to the Court in connection with Paltzer's sentencing, the Government is of

the view that Paltzer's cooperation was extraordinary.

On August 15, 2013, after Paltzer began cooperating, and after the Government had

learned from him that the Vaulted Assets existed, a court order was entered that placed certain

restrictions on the movement of those assets (the "August 2013 Order'). On May 11, 2018,

following discussions between the Government, Paltzer's counsel, and counsel for the Jensens,

this Court entered an order that modified those restrictions (the "May 2018 Order"). The May

2018 Order allows Paltzer to move the Vaulted Assets "to the underlying owners of those assets

and/or their attorneys or pursuant to other instructions, in all instances with advance notice to and

approval of the United States Attorney's Office for the Southern District of New York." The

May 2018 Order does not direct Paltzer to move the Vaulted Assets. Further, the May 2018

Order does not instruct the Government to determine which persons qualify as the "underlying

owners" of the assets. The May 2018 Order simply requires Paltzer to provide advance notice to,

---

[6]    The Government's Position as set forth here has been approved by AUSA Sarah Paul for
inclusion in this letter brief.

# DuaneMorris

The Honorable Jed S. Rakoff
February 7, 2019
Page 9

and obtain the approval of, the Government in the event that he seeks to move the Vaulted

Assets.

The Government understands that Paltzer is now seeking to collect certain fees on the

Vaulted Assets for the period of time between August 15, 2013 and the present (the "Disputed

Fees"). The Government takes no position on whether Paltzer is entitled to the Disputed Fees,

and believes the issue of the Disputed Fees is a matter for Paltzer, the Jensens, and the Jensen

Clients to resolve amongst themselves. The Government, to date, has not sought forfeiture of the

Vaulted Assets, and has been amenable to the release of those assets for, among other things, the

purpose of the Jensens and the Jensen Clients making restitution to the IRS in connection with

their participation in the Offshore Voluntary Disclosure Program. Paltzer has provided the

Government with proposed instructions concerning the removal of certain Vaulted Assets in

order to pay restitution to the IRS. The Government believes that the proposed instructions are

in accord with the May 2018 Order. Under these circumstances, the Government does not

believe that Paltzer's collection of the Disputed Fees would be a violation of either his

cooperation agreement or the terms of his supervised release. The Government further believes

that Paltzer is in full compliance with the terms of both his cooperation agreement and his

supervised release in this case.

# DuaneMorris

The Honorable Jed S. Rakoff
February 7, 2019
Page 10

## V.    There is No Merit to the Jensens' Allegations

On January 16, 2019, counsel for the Jensens and for the Clients[7], for the Government

and for Paltzer summarized in a conference call with the court their respective positions

regarding the matters addressed in this letter brief.  Paltzer responds to the three positions

asserted by the Jensens and the Clients during that conference call.

### A.    The collection of a custody fee for the storage of the Vaulted Assets is unrelated to Paltzer's criminal conduct.

Paltzer pleaded guilty to criminal activity as alleged in the Superseding Information.

There are no averments in either the Indictment or the Superseding Information that state any

facts regarding the Jensens, the Clients or the Vaulted Assets. Paltzer pleaded guilty on August

16, 2013. The Disputed Fees are for the period August 15, 2013 through the present. The

Disputed Fees are not the proceeds of criminal activity; if they were the Government would seek

forfeiture but the Government has not done so. In fact, the Government's position is that the

receipt of the Disputed Fees would not constitute a violation of Paltzer's cooperation agreement

---

7    It is unclear how the Jensens and the Clients have standing in this criminal matter. They
are not parties to *US v. Paltzer, S1 13 Cr. 282 (JSR)*. They are not victims of Paltzer's criminal
conduct. If Paltzer were trying to profit from any illegal activity or was in violation of his
cooperation agreement or the conditions of his probation (which he is not), the proper
complainant is the Government. The Government has raised no concerns regarding any of these
matters. If there is an issue regarding how Paltzer plans to deal with the Vaulted Assets that too
is an issue for the Government. The Jensens and the Clients may certainly object to Paltzer's
claim to the Disputed Fees. But the proper forum for that dispute is a civil proceeding in
Switzerland.

DuaneMorris

The Honorable Jed S. Rakoff
February 7, 2019
Page 11

or any conditions of his supervised release. Accordingly, Paltzer will not profit from any

criminal activity by collecting a contractually agreed custody fee for the storage of the Vaulted

Assets.

## B.    Paltzer is not in violation of his plea agreement with the Government or of the conditions of his supervised release

Paltzer is fully compliant with his cooperation agreement and he is not in violation of any

conditions of his supervised release.

## C.    The Court Order does not nullify the custodial Fee Agreement.

The Fee Agreement provides for the payment of a custody fee by the Clients[8].

Switzerland is where the Fee Agreement was entered into, where the Jensens instructed Paltzer

to store the Vaulted Assets, where Paltzer works and where the Jensens met with Paltzer with

respect to the Vaulted Assets. Paltzer's claim to the custody fee is a question of Swiss

contractual law, properly decided by a Swiss court.

The Jensens and the Clients assert that due to the "freeze" put on the Vaulted Assets by

the Court Order, the assets were in the custody of the court and Paltzer could not act in

connection with the Vaulted Assets. That assertion is not relevant, as the custody fee did not

require Paltzer to engage in any activity relative to the Vaulted Assets. The custody fee is due

whether Paltzer engaged with the Vaulted Assets or not. Had the Jensens requested Paltzer to

---

8    The parties agree to the amount of the fee.  They have been calculated correctly in the
Jensen Asset Sale and Transfer Breakdown.  The Clients would have had to pay higher fees for
the custody of physical gold to other providers of custody services.  It is Paltzer's entitlement to
the fee starting August 2013 that is in dispute.

DM3\5608517 1

DuaneMorris

The Honorable Jed S. Rakoff
February 7, 2019
Page 12

access the vaults, for instance to secure funds to pay their tax liabilities, Paltzer would have done

exactly what he is doing now: He would have had his counsel contact the Government and

discuss a process for paying the IRS in a manner consistent with the Court Order.

The Clients would have had to pay a custody fee, irrespective of whether Paltzer or

someone else had custody of the Vaulted Assets. Voiding the Fee Agreement would result in the

Clients' unjust enrichment.

Whether any of the foregoing affects Paltzer's claim to the Disputed Fees is a question of

Swiss contract law for a Swiss court.

## VI. Conclusion

The Proposed Instructions are in accord with the Court Order. The court's approval of the

Proposed Instructions will result in the payment of outstanding U.S. tax liabilities. If the

Proposed Instructions are executed, the Vaulted Assets remaining in the vault will be comprised

of the Disputed Fees and the Litigation Reserve and will remain under the control of the Court

Order until the controversy over the Disputed Fees is resolved at which time those Vaulted

Assets will be disbursed in accordance with the Court Order.

Respectfully submitted,

Thomas W. Ostrander
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, PA 19103-4196
Phone: +1 215 979 1802
Fax: +1 215 689 3639
Email: Ostrander@duanemorris.com
Attorney for Defendant Edgar Paltzer

DM3\5608517 1

**DuaneMorris**

The Honorable Jed S. Rakoff
February 7, 2019
Page 13

cc:    Sarah E. Paul, AUSA (*via E-mail*)
       Mark E. Matthews, Esq. (*via E-mail*)
       Michael Stein, Esq. (*via E-mail*)

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
TAIWAN
BOSTON
HOUSTON
AUSTIN
HANOI
HO CHI MINH CITY

# DuaneMorris®

*FIRM and AFFILIATE OFFICES*

THOMAS W. OSTRANDER
DIRECT DIAL: +1 215 979 1802
PERSONAL FAX +1 215 689 3639
*E-MAIL* ostrander@duanemorris.com

*www.duanemorris.com*

SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NEWARK
LAS VEGAS
CHERRY HILL
LAKE TAHOE
MYANMAR
OMAN
*A GCC REPRESENTATIVE OFFICE*
*OF DUANE MORRIS*

ALLIANCES IN MEXICO
AND SRI LANKA

February 21, 2019

VIA E-MAIL
Katherine_Munyan@nysd.uscourts.gov

The Honorable Jed S. Rakoff
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1340
New York, NY 10007

   Re: USA v. Edgar Paltzer; No. 1:13 CR 282-01 (JSR)

Dear Judge Rakoff:

   In accordance with the court's directive of January 16, 2019, Edgar Paltzer submits this

reply letter brief. Paltzer addresses below the matters raised in the Jensens' opening letter brief

and other material matters.

## 1. The Jensens have no standing in this criminal matter.

   The Jensens'[1] opening letter brief was filed on their own behalf. The issue raised by the

Jensens concerns Paltzer's claim to a custody fee ("the Disputed Fees") for the storage of the

Clients' Vaulted Assets. The Jensens themselves were not charged a fee for the storage of their

---

[1] Defined terms are as set forth in the Paltzer Opening Letter Brief

DUANE MORRIS LLP

30 SOUTH 17TH STREET   PHILADELPHIA, PA 19103-4196      PHONE. +1 215 979 1000   FAX: +1 215 979 1020
DM3\5638024 1

DuaneMorris

The Honorable Jed S. Rakoff
February 21, 2019
Page 2

Vaulted Assets. The Clients did not file an opening brief. However, the Disputed Fees are payable only by the Clients who in this proceeding have raised no objection, although represented by their own counsel.

The Jensens have not cited any basis for their participation in this criminal matter. They have not intervened in *U.S.A. v. Paltzer*. They are not victims of Paltzer's criminal conduct. They have not cited any statute or judicial precedent that permits their appearance before the court.

Assuming a basis for jurisdiction exists, the Jensens lack standing to complain about the Disputed Fees as there is no case or controversy between the Jensens and Paltzer regarding the Disputed Fees since the Jensens were not charged any Disputed Fees. Any case or controversy between Paltzer and the Jensens is limited to the Litigation Reserve, which Paltzer proposes to leave in the vault because the Jensens have threatened Paltzer with litigation. The amount of the Litigation Reserve (approximately $390,000) is modest considering that the Jensens told Paltzer, that they will sue him for the loss of value of the stored gold since August 2013 and for additional unspecified damages, if he did not immediately comply with their settlement demand.

No consideration should be given to the Jensens argument regarding the Disputed Fees.

## 2. Paltzer Was Not Investigated and Did not Plead Guilty with Respect to the Vaulted Assets

The Jensens assert that the Vaulted Assets "are part of the pattern of activity for which Paltzer was investigated and pled guilty".[2] This is incorrect.

---

[2] Jensens' Opening Letter Brief at 11. As described above, the "case or controversy" is over the Litigation Fund. The "activity" concerning the Litigation Fund is the Jensens' threat of

DuaneMorris

The Honorable Jed S. Rakoff
February 21, 2019
Page 3

In the course of Paltzer's cooperation, he provided information to the government

concerning persons he knew to be non-compliant with their U.S. tax reporting responsibilities.

He also provided information regarding persons he knew to be compliant and persons for whom

he had no opinion regarding their compliance with U.S. tax reporting requirements. The Jensens

had told Paltzer that they and the Clients were U.S. tax reporting compliant[3]. Paltzer provided

the government information regarding the Vaulted Assets because he wanted his cooperation to

be not only accurate but also complete.

Paltzer provided the government information concerning the Jensens and the Clients after

the return of the indictment. The government was unaware of the Jensens' and the Clients'

activities at the time of the indictment, April 2013. The Indictment makes no mention of the

Jensens or the Clients. Accordingly, the situation regarding the Vaulted Assets was not "part of

the pattern of activity for which Paltzer was investigated and pled guilty" as the Jensens allege.

The Jensens allege that the government "has always treated the [Vaulted Assets] and its

content as part of Paltzer's criminal activity."[4] The Jensens point to the Court Order to support

this claim. The facts leading to the filing of the Court show that the Jensens' claim is unfounded.

---

litigation and Paltzer's establishment of the Litigation Fund. None of Paltzer's activity in
that regard can be considered criminal.

[3] Paltzer established the vaults at the Jensens request that Paltzer hold the Vaulted Assets.
Contrary to the Jensens' assertion, (Jensens' Opening Letter Brief at 4) Paltzer did not advise
the Jensens that the physical assets held in the vault were "unreportable to the IRS".

[4] Id.

The Honorable Jed S. Rakoff
February 21, 2019
Page 4

After the Indictment, the Jensens (and later the Clients) entered the OVDP and made disclosures to the IRS concerning "the offshore assets"[5]. Also after the Indictment but well before the Court Order, the Jensens visited Paltzer in Zurich. During that visit, they asked Paltzer to return to them certain diamonds and stamps he held outside the vault. They also suggested that a friend could pick up the gold, an apparent reference to the Vaulted Assets. Paltzer declined. At a second meeting in Zurich, the Jensens advised Paltzer that they and all the Clients were going into the OVDP and that they sought access to various documents at Paltzer's former law firm. Paltzer again declined to assist them. Paltzer later learned that a former client of the Jensens secured the assistance of an American attorney in Zurich to review documents at Paltzer's former law firm. While there the client took the files without the law firm's permission and made physical threats against a law firm employee supervising the file review. The files were later returned. At this point Paltzer was concerned about his personal safety.

Before the entry of the Court Order and during the course of Paltzer's extensive cooperation occurring in part between July and August 2013, Paltzer provided the government information regarding the Jensens and the Vaulted Assets.

---

[5] Jensens' Opening Letter Brief at 5. "In April 2013, the Jensens learned from a newspaper article that Paltzer had been indicted.... The Jensens immediately ....entered the IRS Offshore Voluntary Disclosure Program ("OVDP"). ... The Jensens and the Owners made a full and complete disclosure to the IRS concerning the offshore assets...". It is unclear whether these disclosures concerned the Vaulted Assets or some other "offshore assets". What is also unclear is the nature of the conduct disclosed by the Jensens or the Clients, respectively, since the IRS considered some of the Clients' conduct as "non-willful". See Jensens' Opening Letter Brief at pages 5 -6.

DM3\5638024 1

DuaneMorris

The Honorable Jed S. Rakoff
February 21, 2019
Page 5

Before the Court Order was entered, the government was aware: (1) that the Jensens and the Clients owed taxes to the IRS; (2) that Paltzer was holding the Vaulted Assets, whose owners were the Jensens and the Clients and (3) the nature of the Jensens' and their former client's activities in Zurich.

Accordingly, an application to the court was jointly prepared by Paltzer's counsel and counsel for the government. The Court Order was entered, with Paltzer's consent, to protect the Vaulted Assets from disbursement to anyone without the government's approval. Under the circumstances, it was prudent to ensure that the Vaulted Assets remain available, if necessary, to pay the Jensens' and the Clients' tax obligations and to provide Paltzer with a barrier to any request that he remove assets from the vault.

The Jensens state that "... Paltzer knew that his conduct with regard to the Vault and related assets was part of his overall criminal activities. As an example, in connection with the account attached to the Vault at UBS, and in violation of Swiss law, he signed a false Form A..."[6] This "fact" is false. The so-called "Linked Account" was opened more than 20 years before the vault was rented. There is no Form A associated with the rental agreement for the vault containing the Vaulted Assets. Thus, there is no "false Form A" as claimed by the Jensens.

Finally, the Jensens allege that Paltzer created false "structures" for "at least three of the Owners...designed to assist [them] in concealing assets from the IRS..." [7]There was no discussion between Paltzer and the Clients about not disclosing the "structures" to the IRS.

_____

[6] Jensens' Opening Letter Brief at 11

[7] Id.

DM3\5638024 1

DuaneMorris

### 3. Paltzer Has Never Claimed to be an "Underlying Owner" of the Vaulted Assets

The Jensens state that "Paltzer's assertion that he became an "underlying owner" of the

assets when the Freeze Order was signed is simply not consistent with the facts."[8] Paltzer has

never made this assertion[9] and agrees that he is not an "underlying owner" of the Vaulted Assets.

The Jensens' apparent basis for this assertion is the Proposed Instructions. Those

instructions provide that an amount equal to the Disputed Fees will remain in the vault pending

the resolution of the Disputed Fees controversy. Retaining the Disputed Fees in the vault is

hardly claiming an ownership interest in the Vaulted Assets. After all, the funds remaining in the

vault are subject to the Court Order and may not be disbursed without the approval of the

Government. Paltzer in fact does claim he is owed the Disputed Fees but until the resolution of

the controversy regarding the Disputed Fees he has no right to remove those fees from the vault.

### 4. The Fee Agreement for the Custody of the Vaulted Assets Is a Legal Contract Under Swiss (and presumable any other) Law

Paltzer has never stated as the Jensens allege in another false fact that he is entitled to the

Disputed Fees because "... his associations with the Underlying Owners are not illegal under

Swiss law..."[10]. There is nothing nefarious about the Fee Agreement and it is presumably a

valid contractual arrangement under the law of any jurisdiction. Swiss law is important here

---

[8] Jensens' Opening Letter Brief at page 12

[9] Presumably had the Jensens any facts to support their claim, those facts would have been stated but none are. The position that Paltzer made this assertion is baseless.

[10] Jensens' Opening Letter Brief at page 13

DuaneMorris

The Honorable Jed S. Rakoff
February 21, 2019
Page 7

from the perspective that the Fee Agreement was made in Switzerland, by Paltzer and the
Jensens and concerns assets located in Switzerland. Swiss law is the choice of law to determine
whether Paltzer is entitled to the Disputed Fees.

### 5.    Paltzer Has Never Concealed his Claim to the Disputed Fees

The custody fees are based on a written Fee Agreement, which is not in dispute. The fees
have been recorded in documents maintained by Paltzer and the Jensens over many years. There
is nothing surreptitious about the fees.

The Jensens suggest there is something untoward about the notion that "... [Paltzer]
provided little input to the carefully constructed resolution process [regarding the Vaulted
Assets] agreed to by the Owners, the Jensens, the IRS, UBS and the USAO and then only at the
end asserted his fee demands."[11] Assuming for the moment that this is an accurate recitation of
the events, the fact that a party weighs in on the particulars of a draft agreement toward the end
of a process proves nothing. During the timeframe referenced by the Jensens, their counsel was
aware of the fee issue and wrote on August 2, 2017: "We're trying to finalize MOUs ... but that
keeps raising the issue of any fees due to Paltzer. Can we... resolve that? ..." It appears that the
Jensens were negotiating technicalities with the bank during 2017 and 2018. At that time Paltzer
was concerned with other matters. He is a sole practitioner with a business to run. Paltzer was
cooperating with the government. He was preparing for his sentencing. Simply stated, with
respect to the Disputed Fees the Jensens and Paltzer were both otherwise occupied.

---

[11] Jensens' Opening Letter Brief at 13

The Honorable Jed S. Rakoff
February 21, 2019
Page 8

# DuaneMorris

The Jensens aver that Paltzer was not "particularly forthcoming" if he did not list 'the accrued fees for managing these assets as receivables on his financial statement submitted to the Court..."[12] (There are no fees for "managing" the Vaulted Assets", the Fee Agreement is for the custody of the Vaulted Assets and are due whether there is activity associated with the Vaulted Assets or not."). In any event, hypothetically, if Paltzer were not forthcoming in any fashion, the Government would complain. Yet here, the government has not complained. The Government has taken the position that Paltzer's collection of the Disputed Fees would not be in violation of either his cooperation agreement or the terms of his supervised release.

## 6. Paltzer Has Submitted to the Government Proposed Instructions for the Transfer of the Vaulted Assets in Order to Pay the Jensens' and the Clients' U.S. Tax Liabilities

The Jensens suggest that it is Paltzer who has delayed the process regarding the disposition of the Vaulted Assets.[13] Finger pointing aside, the fact is that Paltzer delivered Proposed Instructions for the Vaulted Assets to the Government in late November 2018. The Proposed Instructions provide for the payment of the Jensens' and the Clients' tax liabilities and the retention in the vault of an amount equal to the Disputed Fees and the Litigation Reserve, under the continued supervision of the court by way of the Court Order and the requisite Government approval of any transfer of Vaulted Assets. The Government's position is that these Proposed Instructions are in accord with the Court Order.

---

[12] Id.

[13] Jensens' Opening Letter Brief at Heading 4.e. page 14

The Honorable Jed S. Rakoff
February 21, 2019
Page 9

DuaneMorris

## 7.     The Proposed Instructions are Consistent with Paltzer's Cooperation Agreement

The Jensens assert that "…Paltzer's conduct in concealing U.S. taxpayer assets in the
Vault under a Swiss Form A, and in his name only, was criminal…"[14] There is no Form A. The
Government has known for years that the vault holding the Vaulted Assets is rented in Paltzer's
or his wife's name. The Jensens have proffered no evidence that Paltzer's activity relative to the
Vaulted Assets is criminal.

## 8.     Paltzer Simply Seeks to be Paid by the Terms of the Fee Agreement

The Jensens assert that "…if the Unfreeze Order permits Paltzer to collect his demand for
over $1.1 million in fees and "costs" , the Freeze Order would …. [result] in a windfall profit to
Paltzer…"

This assertion is incorrect. The execution of the Proposed Instructions will only result in
the delivery of Vaulted Assets to their owners, the payment of outstanding taxes and the
retention in the vault of an amount equal to the Disputed Fees and the Litigation Fund, under the
continued control of the Government by way of the Court Order. The Clients would have been
required to pay custody fees for the Vaulted Assets to another party had Paltzer not been
involved. Vitiating the Fee Agreement would simply result in a windfall to the Clients.

In any event, the approval of the Proposed Instructions does not award Paltzer the
Disputed Fees. The controversy over the entitlement to the Disputed Fees is for another day and
another forum.

---

[14] Jensens' Opening Letter Brief at 14.

DuaneMorris

The Honorable Jed S. Rakoff
February 21, 2019
Page 10

## 9.    **Conclusion**

But for the issue of the Litigation Reserve, the Jensens have no standing in this matter.

To date there has been no activity regarding the Litigation Reserve other than Paltzer's stated

intention to have an amount equal to the Litigation Reserve remain in the vault, under the control

of the Government by way of the Court Order. This "activity" is not criminal. The Government

and Paltzer agree that the Proposed Instructions are in accord with the Court Order and this court

should authorize the Government to approve the Proposed Instructions.

Respectfully submitted,

Thomas W. Ostrander
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, PA 19103-4196
Phone: +1 215 979 1802
Fax: +1 215 689 3639
Email: Ostrander@duanemorris.com
Attorney for Defendant Edgar Paltzer

cc:     Sarah E. Paul, AUSA (*via E-mail*)
        Mark E. Matthews, Esq. (*via E-mail*)
        Michael Stein, Esq. (*via E-mail*)